## BROWNING v. EQUITABLE LIFE ASSUR. SOC. OF THE UNITED STATES.

No. 5822.   Decided October 29, 1937.   (72 P. 2d 1060.)

534

*Hurd & Hurd,* of Salt Lake City, for appellant.

*Gustin & Richards,* of Salt Lake City, for respondent.

For opinion on rehearing see 94 Utah 570, 80 P. 2d 348.
WOLFE, Justice.

This is a suit by plaintiff to recover indemnity for total and continuous disability in performing any and every duty in plaintiff's profession as an oral surgeon from April 20,

1934, to December 18, 1934, and later by supplemental complaint to March 5, 1935, on a policy issued by defendant to plaintiff on September 23, 1921, providing for weekly indemnity for total and partial disability caused by accident.

On April 19, 1934, Dr. Browning, in a fall, bent back and sprained his index finger on the right hand. The injury was to the soft parts, that is, to the ligaments or fiber thereof, but not the bone. The finger was put in a splint from April 20 to May 15, 1934, during which time Dr. Browning was unable to perform any duties in connection with his profession. From May 15th to June 12th the finger was treated by heat devices and massage. This is the period of dispute, as to whether he was totally or partially disabled. Since it is about this period which the main points of this case turn, we shall at this time omit recital of the evidence in regard thereto, considering it in detail later. From June 12 to August 20, 1934, the finger was again in splints. From August 20th to 28th it was free; from August 28th to September 26th it was again in splints. In October, 1934, plaintiff went to a bone specialist in California and since then has performed no duties pertaining to his profession. Oral surgery takes in extractions of teeth, treatment of all diseases, and lesions of the oral cavity, such as removal of cysts, tumors, treatment of osteomyelitis, reduction of fractured jaws, and removal of infected teeth. The hands and fingers play a most important part and the index finger of the right hand in a right-handed person is the most important outside of the thumb.

On September 23, 1921, defendant issued an insurance policy to plaintiff. The policy contemplated weekly indemnity for disability caused by accident. At this time plaintiff gave his occupation as a dentist. In 1923 the policy lapsed but on June 16th of that year it was reinstated. In his application for reinstatement, plaintiff gave his occupation as "Dental surgeon." An incidental point is made which may at this time be disposed of, that defendant did not know at the time of issuing the policy that plaintiff was practicing

oral surgery because in 1921 he made application for insurance as a dentist. The application for reinstatement which apprised defendant in 1923 that plaintiff was practicing oral surgery is a sufficient answer to this contention.

The defendant paid indemnity for the first 60-day period from April 20 to June 18, 1934, inclusive, amounting to $307.15 to cover 26 days of total disability ($185.72) and 34 days of partial disability ($121.43). This was in response to a claim filed on June 23d made out on a blank furnished by defendant and signed by plaintiff, which, in answer to question 8 of the blank, reading as follows: "Date and hour on which you became completely unable to perform the duties of your occupation," stated, "19th day of April, 1934, at 7 o'clock P. M. *and again* on June 13th, 1934." (Italics supplied.) And which, in answer to question 9 of the blank, reading: "Date and hour on which you were *first* able to resume any of the duties of your occupation," stated "16th day of May, 1934, at 9 o'clock A. M. until June 13th, 1934." (Italics supplied.) On October 29, 1934, plaintiff filed a further claim on a like blank and to the same questions 8 and 9 answered, respectively, as follows:

"8. Date and hour on which you became completely unable to perform the duties of your occupation? —April 19th to May 20th  June 13th to Aug. 20th  Aug. 28th to Sept. 26th.

"9 Date and hour on which you were first able to resume Any of the duties of your occupation? —May 21st to June 12th  Aug. 20th to Aug. 27th  Sept. 26th."

Appended to this claim was the following:

"In explanation of the above dates I have not been able to work every day since Sept. 26th on account of the severe pain. Some days I am not able to do anything on account of the pain. For that reason I am compelled to leave the city and give it a complete rest. I am leaving for San Francisco tomorrow to see a nerve specialist. While there I will also see your Company physician see my finger."

On July 11, 1934, plaintiff wrote defendant in part as follows:

"Thank you for your check for the first 60 days of my disability. I cashed the check before I noticed a mistake in the amount so I am writing to notify you of the change which should be made in the days of partial disability. The first 60 days disability should read, 28 days partial disability and 32 days total disability.

"If you will please refer to my claim and also to the Physician's report, you will find that the accident occurred on April 19th and my finger was placed in a splint until May 16th at which time I went on partial disability. The finger, however, did not heal and on June 13th, I was forced to quit practicing and have been on total disability ever since. It is still in a splint and will be for several days longer which naturally prevents me from doing any operating."

In response to this letter, defendant paid $21.41 more on the theory that there were 32 continuous days of total disability preceding the 28 days of partial, instead of as appeared on the first claim for indemnity. Maloney, a witness for defendant, in a deposition testified that he did not notice the second paragraph of the letter of July 11, 1934, or he would not have made this adjustment, and that all he intended to do was to allow 6 days more of total disability in the first 60-day period, added on to the period from April 20th to May 15th. The plaintiff makes a minor point of the fact that such extra payment should be considered as a payment of total disability from June 13th to June 18th, inclusive, it being within the first 60-day period and that by such payment the company recognized that the partial disability period, if any, within the first 60 days did not break the continuity of the total disability period or at least, if so, that the company waived the effect of such interruption. We think the case is solvable on more fundamental principles. These entail a consideration of the law and the evidence.

In order to understand the first issue over which the parties contend, we quote the weekly indemnity provisions of the policy:

"A. If such injuries shall *wholly and continuously* disable the Insured from date of accident and prevent him from performing *any* and *every* duty pertaining to *his* occupation, the Society will pay for

the period of such continuous disability but not exceeding two hundred consecutive weeks the single weekly indemnity hereinafter specified. After the payment of weekly indemnity for two hundred weeks as aforesaid the Society will continue the payment of weekly indemnity of the same amount thereafter so long as the Insured shall be wholly and continuously disabled by such injuries from engaging in any occupation or employment for wage or profit.

"B. Or, if such injuries shall continuously disable the Insured from date of accident and prevent him from performing *one* or *more* important daily duties pertaining to his occupation, or for *like* continuous disability *following* total disability, the Society will pay for the period of such disability, but not exceeding twenty-six consecutive weeks, a weekly indemnity of one half of the amount payable per week of total disability."

We have italicized the words which have been the subject of court construction and upon which defendant relies to show that the disability must be total and continuous as to not only the profession but any and every duty thereof. The respondent does not question the construction that the total disability must be continuous or that indemnity for total disability cannot be recurrent. Indeed, it would seem the language would permit of no other construction. *Irwin* v. *Travelers' Ins. Co.*, 243 App. Div. 377, 277 N. Y. S. 724; *Dietlin* v. *Missouri State Life Ins. Co.*, 126 Cal. App. 15, 14 P. (2d) 331, 15 P. (2d) 188; *Dietlin* v. *General American Life Ins. Co.*, 4 Cal. (2d) 336, 49 P. (2d) 590; *Id.* (Cal. App.) 41 P. (2d) 979; *Ruffino* v. *Metropolitan Life Ins. Co.*, 154 Misc. 628, 277 N. Y. S. 722; *Herold* v. *Aetna Life Ins. Co.* (Tex. Civ. App.) 77 S. W. (2d) 1060; *Massachusetts Protective Ass'n* v. *Jurney*, 188 Ark. 821, 68 S. W. (2d) 455; *Herwig* v. *Business Men's Acc. Ass'n of America* (Mo. App.) 234 S. W. 853; *Coburn* v. *Maryland Casualty Co.*, 224 Ky. 377, 6 S. W. (2d) 471; *Doyle* v. *New Jersey Fidelity & P. G. Ins. Co.*, 168 Ky. 789, 182 S. W. 944, Ann. Cas. 1917D, 851; *Johnson* v. *Travelers' Ins. Co.*, 269 N. Y. 401, 199 N. E. 637.

The respondent contends that under the evidence the continuity of total disability was not broken by the period from

May 16th to June 12th, inclusive. And this is the main issue on this part of the case. The court found that as a result of the accident on April 19, 1934, "plaintiff has been unable to operate the joints of said finger ■ or to use the same in the practice of his profession; that as a result thereof, plaintiff has been ever since said date, and still is, wholly and continuously disabled and prevented from performing any and every duty pertaining to his occupation and profession." It is conceded that, if there is evidence to support this finding, the above contention of plaintiff must prevail. We have already noted that plaintiff himself in his claim specified a period of total disability followed by a period of partial disability in the first 60-day period, in turn followed by a recurrent period of total, a week of partial, and then total until the time of the trial. Nothing is said by appellant as to this being an admission of only a partial disability during part of the 60-day period, although appellant strenuously contends that the plaintiff's acceptance and indorsement of the draft for $307.15, dated July 2, 1934, which had attached to it a statement showing the periods of total and partial disability and amounts paid for each was a "payment of his claim and an accord and satisfaction, settlement and discharge of any and all liability under the policy" for the period of 60 days. The receipt and indorsement signed by plaintiff on the draft read as follows:

"Received of The Equitable Life Assurance Society of the United States the within amount in payment of all claims under its policy No. HY35806 as detailed in the statement of account delivered herewith which statement is retained and the correctness of which is hereby acknowledged."

If necessary, we shall later consider the contentions of accord and satisfaction, discharge and settlement from their substantive standpoints. We set out these documents here as part of the evidence bearing on the question of whether there was a break in the continuity of the total

disability period. It would seem that they might have some bearing as admissions by plaintiff unless it can be said that the evidence of what he actually did in his profession from May 15th to June 18th is so controlling that what he states on his claim and at least technically admits by his receipt are his own conclusions as to what constitutes total and partial disability, which amount to nothing if the evidence itself shows that there was *in law* a total disability, within the construction to be given provisions A and B of the policy above quoted. It is questionable whether a purported admission of a conclusion of partial disability could be such if the facts showed in law a total disability. An admission in the form of a conclusion of fact would hardly be possible if the conclusion of law from the facts from which the admitted conclusion came was directly contrary. Thus, if a helpless invalid admitted partial disability when the facts showed in law that he was totally disabled, the admission would not avail because he does not admit against legal conclusions. But in this case a recital of the plaintiff's evidence soon to be made will reveal that at least it does not show a total disability in law. Therefore, the inverse is the real question: Does the evidence show, together with the statements in the claims filed, a situation where there is room to conclude other than that there was only a partial disability? If so, the court in its finding was correct. If not, the case would have to be reversed on such finding that there was total disability.

The following is the evidence of Dr. Browning with reiterations elicited from direct and cross-examination expunged. He saw patients in his office from May 16th to June 12th, tried to attend to his work, did some extractions but not the difficult ones. Owing to the pain in the index finger when he exerted pressure on it, he could not extract an impounded tooth or reduce a fracture of the jaw. He could extract loose teeth but those with deeply seated roots having no pyorrhea or looseness required too much pressure of the index finger to undertake. He could not use the

pressure necessary to curette or clean out an abscess because the index finger was in the way even if he tried to use the other fingers. He could not do any *difficult* surgery. He did the easy extractions, the others he sent to other dentists. Sometimes he would go to the office in the morning and his finger would throb so badly he would have to quit for the day. He did his X-ray work during this period. He testified in words as follows on cross-examination:

"Q. But, getting back, without going over the details, Doctor, about the essence of the thing was this, wasn't it, that in the main you did most of your duties there in the profession, except such as the difficult extractions and things of that kind; isn't that true? A. Well, I think I have answered that. I said I tried to do them, and some of them I did and some I didn't.

"Q. Those that you didn't do were the difficult extractions weren't they? That is true, isn't it, Doctor? A. I would say yes, when I was in the office. There was a good part of the time when I couldn't be in the office, though. As I told you, when I would run into a difficult one sometimes I would have, the rest of the day that I was gone and to go, and I walked right out of the office.

"Q. During that period you did some extracting? A. I did.

"Q. You did your X-ray work in the main? A. Part of it.

"Q. And your consultation and your diagnosis, and, in the main, you did most of the things with the exception of those that were quite difficult, difficult extractions and those things, that is about the summary of what you did, isn't it? A. That is the same question you just asked me, and I answered it.

"Mr. Hurd: I would like to have the witness give me a direct answer to that question.

"A. Mr. Hurd, I tried to do the simple work, but there were times when my finger would hurt so bad, after doing one, even though it might have been simple, that I would have to leave the office, so naturally I wouldn't be there to take care of other patients, and I couldn't do any of the difficult work. Does that make it clear?"

This gives us the gist of the evidence and some of its flavor as far as the direct words are quoted. Can it be said under this evidence that during the period from April 20th to May 12th he was wholly and continuously disabled from

performing any and every duty of his occupation? If we take the language literally, obviously not. But the interpretation of insurance contracts is an illustration of realism in the law. It was recognized that accident and life insurance were of great social benefit; that they were not of the same type of contract as is drawn up between individuals after negotiation and exchange of views as in special transactions to which the great bulk of contract law pertains. They were sold on the "go" by solicitors, and the great mass of insured did not stop to read them but took them on faith that they would accomplish the objectives which they generally thought and in some cases were led to believe they would accomplish. They came somewhat in the class of telephone messages and those other transactions where there is a superior position of contract on one side. The insurer made the contract, had its terms drawn with meticulous care and accuracy, and was therefore in a position to deny indemnity in many cases where the insured could reasonably believe he was insured. A recognition of the realities of this situation led the courts to give what was called a "liberal" construction to such contracts. This really consisted of actually construing language to mean something which by its very terms it did not mean. But, if it were construed strictly according to its terms, it would have worked a denial of recovery in cases where it was believed the company meant to insure.

This matter of liberalization is illustrated by the following language from our own case of *Colovos* v. *Home Life Ins. Co.*, 83 Utah 401, 28 P. (2d) 607, 609:

"In this matter the court is called upon to construe the contract, particularly the scope and meaning of the following lines set out in the paragraph above quoted: '* * * Prevented from engaging in any occupation and performing any work for compensation or profit.' It is the opinion of this court that the term used, 'engaging in any occupation and performing any work for compensation or profit,' has a well-defined meaning. It means ability to follow any recognized occupation, and to do substantially all the acts that are necessarily and usually performed by one who follows that occupation. It could

not be said that a man could engage in an occupation if he were able to do only one or two of the acts customarily performed by one engaged in such an occupation. Furthermore, there is an element of continuity in following an occupation; that is, the ability to continuously perform substantially all of the ordinary acts which, in the ordinary course of events, a man following such an occupation is called upon to perform. Furthermore, 'compensation or profit,' as used in the paragraph quoted from the policy, is qualified, and relates to the preceding words, 'engaging in any occupation and performing any work,' and contemplates that the compensation or profit to be received from the occupation engaged in, or work done, shall, in a fair sense, be remunerative, and not merely nominal, and in the case at bar a small farmer who could not do substantially all the labor that usually is necessary to be done, or a peddler who cannot lift or handle the bags of produce he is accustomed to peddle, could not conduct his farming or his peddling for profit or compensation in a remunerative sense."

*Gibson* v. *Equitable Life Assur. Society,* 84 Utah 452, 36 P. (2d) 105. Many cases to like effect are to be found in a copious note in 98 A. L. R. 789. But the cases annotated in this same note show that by a process of judicial erosion the courts have in many cases so "liberalized" the language of the policy as to extend it beyond what was fairly within its terms.

In *Cato* v. *Aetna Life Ins. Co.,* 164 Ga. 392, 138 S. E. 787, at page 790, it is stated:

"Policies of insurance will be liberally construed in favor of the object to be accomplished, and provisions therein will be strictly construed against the insurer. * * * But the contract of insurance should be construed so as to carry out the true intention of the parties. * * * The rights of the parties are to be determined by the terms of the policy, so far as they are lawful. The language of the contract should be construed as a whole, and should receive a reasonable construction, and not be extended beyond what is fairly within the terms of the policy. Where the language is unambiguous and but one reasonable construction of the contract is possible, the court must expound it as made."

As stated by Mr. Justice Gilbert of the Georgia Supreme Court in his dissenting opinion in the case of *Prudential*

*Ins. Co. of America* v. *South,* 179 Ga. 653, 177 S. E. 499, 503, 98 A. L. R. 781, the contract of insurance should be construed "so as to carry out the intention of both parties, not merely to the intention of one party." From the cases which hold that "total disability" does not mean a state of absolute helplessness or complete physical or mental incapacity, many of the decisions have made a transition to a point where such limitations on the insurer's liability for total disability have been whittled away to such an extent that an insured who is protected against total disability only may recover for what is actually only partial disability.

In the case of *Prudential Ins. Co.* v. *Harris* (1934) 254 Ky. 23, 70 S. W. (2d) 949, 951, the court classified insurance of this nature into two general classes: One which it termed occupational and the other general. The first type "undertakes specifically to insure only against disability to transact the duties pertaining to or to perform labor in a particular occupation, which is usually that in which the person insured is at the time or is customarily engaged." The other type "undertakes to insure against disability from performing any sort of remunerative labor." The plaintiff's policy partakes of both features successively. For the first 200 weeks the insured is protected in case the accident shall prevent him from performing any and every duty of his occupation. After that the insured can demand indemnity if he "shall be wholly and continuously disabled by such injuries from engaging in any occupation or employment for wage or profit." It seems to us that this throws some light on the interpretation of the protection afforded for the first 200 weeks in respect to plaintiff's particular occupation. Illustrations of cases where a person is disabled from doing *any* and *every* act of his occupation and yet may not be precluded from engaging in any occupation do not come readily to the mind. But, if these words are given a more liberal meaning, it is conceivable that the insured might be able to do some inconsequential things about his

profession and still be wholly and continuously disabled from performing his occupation within the practical meaning of these words. And this is a condition consistent with ability to do some other occupation or employment after 200 weeks. We assume, in other words, that the second limitation of being wholly disabled from engaging in *any* occupation or employment is a stricter limitation and more inclusive than the limitation on the insured's particular occupation, in this case oral surgery. An insured piano player losing a hand would certainly meet the requirements for total disability as far as his profession was concerned, but might have numerous other remunerative occupations open to him if intelligent. On the other hand, we do not conceive of a case where an insured is totally disabled from engaging in any occupation or employment even under the liberal interpretation of those words laid down in the Colovos Case, supra, where the insured was not disabled from following the particular occupation he was engaged in at the time of the accident. The writer has considerable doubt as to whether there was sufficient evidence in the Colovos Case to go to the jury on the question of total disability. But, certainly, if Colovos had had the same kind of policy as plaintiff has in this case—and this court there held that the evidence was sufficient to take the case to the jury on total disability to perform *any* occupation as that language was construed—it would have been sufficient to take the case to the jury on a question of whether he was wholly disabled from pursuing his vocation as a farmer or peddler. In fact, the court in that case simply took his vocation as a farmer and peddler as a pattern and held that there was sufficient evidence to go to the jury in that case on the question of whether he was totaly incapacitated to follow those as meant by the policy, and that this was sufficient basis for an inference that he could not follow like vocations which was all he was trained to do. Consequently, said this court, in effect, there was evidence to show that he could not do *any* work for profit, construing "any work"

to mean such work as he was trained to do, it being inferred that all other lines of work which would also come under the term "any work" he could not do whether well or sick. Thus, there is a question whether at bottom there remains in this jurisdiction any real distinction between a limitation as to disability to do any and every duty of a particular occupation and the limitation as to disability to engage in any work. The doubt may be noted without being resolved.

In the instant case the task of appellant is to convince us that, under the evidence, the factfinder could only come to one conclusion as to the type of disability from May 15th to June 18th, and that was that it was partial; that the evidence precluded any finding that plaintiff was wholly disabled from doing any and every duty pertaining to his profession even though the liberal construction be given to the phrases "wholly" and "any and every," which would not prevent an ability to do inconsequential acts or duties relating thereto to take it out of the class of total disability. As before stated, the writer is of the opinion that by a process of judicial erosion, in which this court has perhaps participated, the words "totally disabled from performing any occupation" have not only been worn down from their literal meaning to a point where they were construed to mean disability to perform substantially all of the material duties of his occupation (which was sensible), but further to a point where in some cases they have been construed to mean where he has been disabled from performing just some of his material duties. If it were not for the Colovos Case and the case of *Gibson* v. *Equitable Life Assur. Society,* supra, the writer would hold that in this case the plaintiff between May 15th and June 18th was performing by his own evidence such a substantial proportion of the material duties of his profession that the trial court would be required under the evidence to hold that he was only partially disabled under the terms of the policy. But in view of the facts of the Colovos Case, which are somewhat parallel, and the rule there laid down, the question of whether plaintiff was

totally disabled was probably for the jury. The doubt should be resolved in favor of the court's ruling.

In this conclusion we are also influenced by the fact that where one tries to pursue his occupation and succeeds under difficulties with the performance of some of its material duties, that fact should not too much mitigate against him as evidence of nontotal disability; otherwise, the insured will take no risk by putting himself in a situation where the company may take advantage of it. We desire to be careful not to lay down a rule which will discourage getting back to work. Such would be a detriment to insurer and insured. We thus find no error in finding No. 4, which finds as part of a greater period that plaintiff was wholly and continuously disabled from May 15 to June 18, 1934.

Appellant claims defense of payment, accord and satisfaction, settlement and discharge. We have already commented on the signed claim by plaintiff and the receipt in the form of an indorsement of the draft signed by him as admissions. Did they constitute absolute defenses? The receipt simply acknowledges payment of so much money as payment for total disability and so much for partial disability. In so far as it may involve an admission on the part of his being only partially disabled part of said time, it is evidence. Outside of that, it is only a receipt for moneys designated to be for certain indemnities. It cannot rise any higher than an admission. We think the acknowledgment of the correctness of the statement which accompanied the draft setting out periods of total and partial disability can only be construed as acknowledgment that the calculations for such designated periods were correct. As to any acknowledgment that there was only partial disability instead of total during part of the time, such acknowledgment again rises no higher than evidence of an admission of that fact, and this evidence, as said before, must be taken in connection with all the other evidence, if indeed we can have an admission of such a conclusion. His stating on the claim form and admitting the correctness of a state-

ment which specified an item in pursuance of the claim for partial disability would seem at the most to involve only an opinion of the plaintiff at the time he signed the papers that he was for the time partially disabled. If, as a matter of ultimate fact, arrived at through legal interpretation of provisions of the policy together with a conclusion from the evidence, his then opinion against himself was wrong, it would not seem to be conclusive. But the question of whether it was evidence in the form of an admission was not argued and is not now decided. We say only that the receipt can rise no higher than an admission, if it be that.

Was it an accord and satisfaction? An accord is an agreement between parties, one to give or perform, the other to receive or accept, such agreed payment or performance in satisfaction of a claim. The "satisfaction" is the consummation of such agreement. There must be consideration for the agreement. Settlement of an unliquidated or disputed claim where the parties are apart in good faith presents such consideration. Where the claim is definite and no dispute but an admittance of its owing, the agreement to take a lesser amount even followed by satisfaction is not good unless attended by some consideration. In this case we do not see the elements of an accord and satisfaction. True, there was a claim. It was filed and paid in accordance with demand with no dispute. If a doctor sends me a bill for $20 when it should have been $30 and I pay it, it is not an accord and satisfaction. It is merely payment of less than I owe. If a dispute between the parties had arisen regarding this matter of partial and total disability, as was before the court, and the plaintiff had then agreed to the settlement of July 2, 1934, and received and cashed the check, it would have been an accord and satisfaction. This is not the case of *Keefe* v. *Fraternal Protective Ins. Co.*, 107 Vt. 99, 176 A. 305, or of *American Ins. Union* v. *Wilson*, 172 Ark. 841, 291 S. W. 417, in which cases there was an acceptance of the check after a dispute and a notice that such acceptance would be in settlement of

the dispute. Nor is it the case of *Spilman* v. *Masonic Mut. Acc. Co.* (Mo. App.) 235 S. W. 479, where the insured, after being paid, discovered that he would have received more if he could establish partial disability than for total disability. In that case he was not only paid under the designation of disability he asked for, but the evidence showed that he was only entitled to indemnity under such designation. The difference between that and the instant case is therefore apparent. Nor is this case like *Wood* v. *Massachusetts Mut. Acc. Ass'n,* 174 Mass. 217, 54 N. E. 541, and *General Accident, F. & L. Assur. Corporation* v. *Harris,* 117 Miss. 834, 78 So. 778, L. R. A. 1918E, 929, in which cases there was a release of "all claims and demands of every name and nature," and that the real physical condition of insured was revealed after such receipt by subsequent events developing and not as here, where the facts were known but the interpretation placed upon them by insured was incorrect.

As to settlement and discharge: It certainly was not a settlement and discharge of defendant's full liability because it is admitted by defendant that it may be liable for further payments for partial disability, but it is said to be a full settlement and discharge for the claims of all character for the 60-day period. It was not a settlement in the sense of agreeing to something in dispute, for at that time there was no dispute. It was settlement only in the sense of being a payment of a claim filed. It was not a discharge in terms. The receipt admitted the correctness of the statement. When this contention is analyzed, it appears to resolve itself into the question whether there was an admission that the character of the disability for the latter part of the 60-day period was partial. And this brings us back again to the matter of the efficacy of the signed claim and indorsed draft as evidence of admissions of plaintiff as to the character of his disability above discussed. At all events it cannot rise any higher than evidence of an admission. It is not a substantive defense under the circumstances of this case.

We now come to the question whether another condition
of the policy was fulfilled; that is, whether the plaintiff's
disability during the entire time the court gave him judg-
ment for was caused by the injuries due to the accident.
The policy provides as far as is material to this question, as
follows:

"The Equitable Life Assurance Society Of The United States Here-
by Insures the person named as applicant * * * against loss *result-
ing directly and independently of all other causes,* from bodily in-
juries effected during the term of this policy solely through external,
violent and accidental means, and against disability from disease
contracted during the term of this policy," etc.

This brings up squarely whether the evidence can support
a finding that the total disability for the entire period
from April 20, 1934, to March 5, 1935, can be said to have
resulted "directly and independently of all other causes."

From this point on this opinion must be considered a dis-
sent and the opinion filed by Mr. Justice LARSON as the
prevailing opinion on this point. Hence, I shall from this
point on register the reasons for my dissent from the
court's opinion as to this question and give my affirmative
reasons for thinking the incapacity of plaintiff was not
caused, after the normal period for recovery of the sprain,
by the accident "directly and independently of all other
causes."

I think the evidence cannot support such a finding. There
is no dispute in the evidence of all the doctors testifying for
plaintiff and defendant that a finger suffering such an in-
jury would at the outside be cured in two months if nothing
supervened. Normal recovery would be within 10 days and 3
weeks. This finger, by testimony of Dr. Spencer, who treat-
ed plaintiff, developed redness and tenderness 2 or 3 weeks
after the injury. Plaintiff had diseased tonsils. Toxemia ex-
isted in his body prior to the accident. Dr. Spencer had pre-
viously treated him for diseased tonsils. His tonsils were re-
moved on May 1, 1934, and he had eleven teeth extracted on
November 16, 1934. Several were infected. While the re-

moval of the tonsils and teeth did not clear up the condition of the finger immediately, it was greatly improved at the time of the trial, and it was testified that such a condition might not clear up for some time, and that a general toxemia such as plaintiff had would tend to localize at a point in the body where trauma occurred and the tissues were weakened; that such localization itself formed a focus for infection which would then have to be separately treated as would the original foci. In fact, from the evidence of all the doctors, Spencer, Owens, and Baldwin, the sprain in the finger localized the toxemia and caused arthritis.

True, Dr. Baldwin, who treated plaintiff from June 18th on, testified for plaintiff, and on cross-examination testified that there was such a thing as traumatic arthritis as well as an infectious arthritis; that there might be an inflammation and swelling of the joint without infection from a bruise of the joint, but he did not testify that the length of time this finger remained impaired was due entirely to the sprain. He testified to the contrary, that the toxic condition would be contributory to the continued disability of the finger. When Dr. Baldwin's testimony is considered all together through the recurring direct and cross-examinations, it permits of only one conclusion, and that is that the toxic condition of the body was the factor which prolonged the impairment of the use of the finger. All the other medical testimony was emphatic to the effect that the disability after the first few weeks was entirely due to the localized effect of the toxemia.

The opinion of the court on the point now being considered accepts this version of the evidence, except that it adds several additions which are not in fact additions but add or subtract emphasis on some parts of the testimony. I cannot see how the purported addition that "the medical evidence indicated that Dr. Browning had some infected teeth and diseased tonsils and, therefore, *probably* some toxemia in his system" (italics mine) serves any purpose, unless it is to attempt to water down the very definite testimony by

Dr. Spencer that Dr. Browning had infected tonsils and that he removed them in his treatment; that infected tonsils discharge toxin into the system, and that he could not explain the condition of the finger without bringing in arthritis, and that arthritis could not occur even with a trauma unless there was a pre-existing condition and a field ripe for it. This evidence, not contradicted but borne out by Dr. Owens and even by Dr. Baldwin when the net result of all his testimony is considered, seems to me to put the fact of toxemia beyond the point of "probably." Moreover, I think the evidence is "not only that the toxemia localized in the injured part and delayed and *perhaps* prevented recovery" (italics mine), but is very definite to the effect that it did prevent recovery and was the sole cause for the continued incapacity. The longest time given by any of the doctor witnesses for recovery from such a sprain without complications was 2 months. Normally and usually it would take about 3 weeks. Thus, it seems to me we are confronted with nothing but a point of law which may be posed as follows: Where a person sprains a finger and the sprained part furnishes a point of attack for toxemia already in the body, and this attack localized into an arthritis by the toxemia causes a period of disability beyond that normally suffered by the sprain alone, but the accident did not itself cause the poison to attack the sprained part, but only furnished an occasion or a field for the attack, is such continued disability due to the accident directly and independently of all other causes?

I am unable to see why the court's opinion on this phase of the case should confine a co-operating cause to an "existing disease," and then go to lengths in the discussion of the nature of a disease and finally conclude that the toxemia suffered by plaintiff was not a disease and therefore an "existing disease" did not co-operate. The matter contained in the opinion as to what is and is not a disease seems to me to be aside the point. Whether we call a pre-existing condition a disease or not does not disturb the fundamental principle

that if such condition of itself caused or prolonged disability such disability is not caused by the accident "directly and independently of all other causes."

An examination of many cases involving disability policies convinces me that it is possible to get at least one case to support any possible position. Some of the courts seem to use the formula, accident plus disability equals liability. But the formula is: Accident plus disability caused by the bodily injuries effected solely by external, violent, and accidental means and resulting directly and independently of all other causes equals liability. I am willing to "liberalize" these phrases, but I do not think they should be liberalized to the point of reading them out of the policy.

It is possible to divide the cases where an accident and another cause other than the accident both have their influence on the disability or death into the following categories:

First. Where the accident itself is caused by a pathological condition. Thus, where a dizzy spell causes a person to fall and fracture his skull. Without discussion or commitment on this class of cases, it would seem to the writer that they would be compensable under the language of the policy because the chain of cause and effect should start from and not before the injury. Any reason why the accident happened, whether carelessness, weak physical condition, or from unavoidability must be ruled out. The causal chain begins from the point of injury. *Manufacturers' Acc. Indem. Co.* v. *Dorgan,* 58 F. 945, 7 C. C. A. 581, 22 L. R. A. 620.

Second. Those in which the accident operates on a preexisting condition and causes an accident by setting such condition in motion as a part of the chain of cause and effect, each effect a new cause but all so many links in the causal chain starting from the accident as the original motivating cause. Thus, where one has a thrombosis and an accident jars loose the clot and floating in the blood stream as an embolus it affects the heart and causes disability or death. Here is a complete chain of cause and effect in which

the diseased or pathological condition is itself operated upon and becomes a link in that chain. *Wheeler* v. *Fidelity & Casualty Co. of N. Y.*, 298 Mo. 619, 251 S. W. 924; *Williams* v. *General Acc., Fire & Life Assur. Corp.*, 144 Kan. 755, 62 P. 2d 856, and cases cited therein. A case wherein the facts are such as to make it doubtful whether it falls under this or the next classification is *McMartin* v. *Fidelity & Casualty Co. of N. Y.*, 264 N. Y. 220, 190 N. E. 414.

Third. Those cases where the insured has a disease or a pathological condition but the disease was not a cause or not the proximate, efficient, or procuring cause—that is, if it played any part it was so insubstantial a part as to be negligible. The question is well illustrated by the case where a person with a chronic disease has his head severed by a train or while lying in bed is killed by an explosion. A closer case illustrating the question involved is *Hill* v. *Great Northern Life Ins. Co.*, 186 Wash. 167, 57 P. 2d 405, and also *Brown* v. *Standard Acc. Ins. Co. of Detroit*, 5 Cal. App. 2d 636, 43 P. 2d 555, where the court held that a directed verdict in favor of the insurance company was correct because it appeared that the paralysis from which plaintiff suffered was not only caused by a bump on the head causing an intracranial hemorrhage but was also due to a diabetic condition. *Ogilvie* v. *Aetna Life Ins. Co. of Hartford*, 189 Cal. 406, 209 P. 26, 26 A. L. R. 116; *Sullivan* v. *Metropolitan Life Ins. Co.*, 96 Mont. 254, 29 P. 2d 1046. It is sometimes difficult to tell when the case graduates out of this class into the next class. The last three cases above mentioned might be included in the fourth class.

Fourth. Those cases in which the accident and the pathological condition cooperate in producing death or disability, not so much as a link in a causative chain, but as a co-operative and contributing cause. In short, a cause hooked up parallel, rather than in series, as is the case under the second classification. The class again divides into those cases in which the pathological condition is aggravated and becomes a contributing cause which partakes of the nature of

the second class and those cases in which the injury and pathological condition both contribute to the death or disability interdependent only in the sense that the accident may have weakened the insured so as to permit the pre-existing condition to operate more effectively. The latter case is the case at bar. The authorities divide on the question as to whether the cases under this class are excluded from recovery by the clause reading "directly and independently of all other causes."

To exclude from recovery: *Leland* v.· *Order of United Commercial Travelers of America,* 233 Mass. 558, 124 N. E. 517; *Runyon* v. *Commonwealth Casualty Co.,* 109 N. J. L. 238, 160 A. 402; *Stanton* v. *Travelers' Ins. Co.,* 83 Conn. 708, 78 A. 317, 34 L. R. A. (N. S.) 445; *First National Bank of Birmingham* v. *Equitable Life Assur. Soc. of U. S.,* 225 Ala. 586, 144 So. 451; *Kerns* v. *Aetna Life Ins. Co.* (C. C. A.) 291 F. 289; *White* v. *Standard Life & Acc. Ins. Co.,* 95 Minn. 77, 103 N. W. 735, 884, 5 Ann. Cas. 83. Other cases could be added.

To permit recovery: See cases cited in *Williams* v. *General Acc., Fire & Life Assur. Corporation,* 144 Kan. 755, 62 P. (2d) 856.

Fifth. Where the accident introduces the infection and the infection causes disability or death. *Carroll* v. *Fidelity & Casualty Co. of N. Y.* (C. C.) 137 F. 1012, cited in Mr. Justice LARSON'S opinion. Where the infection enters later through a port of entry caused by the accident, some cases hold the entry of the infection itself an accident.

Naturally, there is an overlapping and a blending of these classes. I have set them out in the hope that it would aid in revealing distinctions which may determine whether or not the clause under discussion excludes recovery. In the cases cited, there are included those in which the policy had, in addition to the phrase under consideration, the following clause, "and did not result directly or indirectly from illness or disease of any kind." Whether this really adds anything to the phrase under consideration, it is not

necessary at this time to determine. I note it because some of the cases may have considered that it did, and for that reason concluded that recovery could not be had under the policy.

In the case at bar there was an army ready to attack and the accident furnished the occasion but had nothing to do with creating the toxemia or of moving it into action. It came as the army of occupation because it found a place somewhat defenseless because of the accident. The accident may have set the stage but it did not move the actors onto it. They came on of their own accord after the stage was constructed, or, more accurately, they were always present and only became effective in causing arthritis when the accident decreased the resistance. Perhaps in the same way, we might say that the carpenter that builds a stage causes the play, but we could hardly say that he caused it directly and independently of all other causes. The introduction of the proximate cause rule, a part of the law of negligence, into this case, seems to me to be confusing the law of negligence with the law of contract.

True, in a negligence action any result which was proximately and naturally caused by the negligence is recompensable. If I were injured and toxemia in my body attacked the injured part and I suffered damage, the person who negligently injured me could be held to respond. Why? Because he is liable for all the effects which might naturally flow from his act as it applies to me. And as to me, it naturally resulted that toxemia attacked the weakened part. But what may naturally ensue under a given set of circumstances is far different than what may ensue from an accident independent of all other causes. The insurance company, by these very words, attempts to shield itself from the enlarged responsibility which would come by application of the negligence rule and charges a premium on the supposition that it is obtaining a limited liability. For us to enlarge that obligation beyond even a liberalized construction of the language in the end works a hardship on all who

seek insurance. It means that premiums must be charged in view of the increased liability and makes it more difficult for persons of ordinary means who need to be protected against the hazards of accidents, rather than sickness, from obtaining such protection. Moreover, it makes it more difficult or impossible for known sick people to obtain accident policies.

A homely illustration will serve to show the difference between this case and those which are set out in the prevailing opinion on this phase of the case. Two contiguous nations are enemies. An earthquake greatly weakens one. The other attacks. Can it be said that the damage caused by the attacking army was caused by the earthquake directly and independently of all other causes? In the instant case, the sprain was the earthquake to the finger. The attacking army moved in—was not pushed or moved or pulled in by the sprain. The attacking army was always present and simply found a weakened place to attack. The attack was a cause of disability for which the injury gave an opportunity but was itself a cause independent of the accident. On the classification and illustration given, practically every case cited in support of the proposition contained in the prevailing opinion may be differentiated from the instant case.

In the case of *Isitt* v. *Railway Passenger Assurance Co.*, 22 Q. B. Div. 504, cited in the opinion of Mr. Justice LARSON, it was held that "pneumonia caused by taking cold while confined in bed as the result of an accident, when this would not have occurred had the person been in normal health," was an effect of an injury caused by accident. The clause in the policy under which it was sought to recover for the death of the insured in that case read, "the effects of injury caused by accident." The court in that case held that the pneumonia was caused by the weakened condition due to the injury and, therefore, it was an effect of the injury. While I think the language of the policy in the Isitt Case is not as specific or as strong in excluding independent

causes of disability as the language of the policy in this case, it is true that the court in that case construed the "effect of injury" to include any effect naturally and proximately resulting as in the case of negligence. While I have doubt as to the correctness of that decision, I do not think such rule can be applied under the language of the policy here under consideration. While there may not be much doubt that the negligence rule of proximate cause would be applicable to such a situation where the pneumonia could not otherwise have occurred, to say that the pneumonia was caused by the accident directly and independently of all other causes under such circumstances is simply perverting language.

I think the testimony shows uncontradictedly that the toxemia was the cause of the prolonged disability, and that as a matter of law the sprain was not the direct cause independently of all other causes of such prolonged disability. The evidence is all to the effect that, after two months at the outside, the disability was due to a supervening cause, and therefore it did not result from the injury independently of all other causes. It is not necessary to interpret the word "direct" as used in the above-quoted provision. Perhaps some "liberalization" may be necessary in interpreting that word so as not to mean immediate in the sense that there can be no intervening links in the causative chain.

In this case the existing toxemia attacked an impaired part. It existed independently of the injury. The causes are hooked up in parallel and not in series. The insurer contracted to pay for disability solely caused by an accident and not a disability caused by the localization of toxemia in the body not caused by the accident but which beset the part because the accident has presented the opportunity.

The contract precludes recovery where the disability is appreciably dependent on other causes than the injury, that is, where some independent factor intervenes to cause or prolong it beyond what the injury caused. Any other interpretation would require the insurer to pay indemnity for

the possession of an impaired finger rather than indemnity for disability totally caused by the injury to the finger.

The following cases appear to me to support the thesis advanced in this opinion on this phase of the case: *Wrobel* v. *General Acc., Fire & Life Assur. Corporation,* 288 Mass. 206, 192 N. E. 498; *Ewing* v. *Equitable Life Assur. Soc. of U. S.,* 320 Pa. 577, 182 A. 369; *American National Ins. Co.* v. *Briggs* (Tex. Civ. App.) 70 S. W. (2d) 491; *Id.* (Tex. Civ. App.) 90 S. W. (2d) 602; *McMartin* v. *Fidelity & Cas. Co. of N. Y.,* 264 N. Y. 220, 190 N. E. 414; *Cretney* v. *Woodmen Acc. Co.,* 196 Wis. 29, 219 N. W. 448, 62 A. L. R. 675; *Smith* v. *Federal Life Ins. Co.* (D. C. Tex.) 6 F. (2d) 283; *Maryland Cas. Co.* v. *Morrow* (C. C. A.) 213 F. 599, 52 L. R. A. (N. S.) 1213; *Provident Life Ins. Co.* v. *Campbell,* 18 Tenn. App. 452, 79 S. W. (2d) 292; *National Masonic Acc. Ass'n of Des Moines* v. *Shryock,* 73 F. 774, 20 C. C. A. 3, 5; *Travelers' Ins. Co.* v. *Melick,* 65 F. 178, 12 C. C. A. 544, 27 L. R. A. 629; *Kerns* v. *Aetna Life Ins. Co.* (C. C. A.) 291 F. 289; *Romanoff* v. *Commercial Travelers' Mut. Acc. Ass'n of America,* 243 App. Div. 725, 277 N. Y. S. 291; *Reynell* v. *Indemnity Ins. Co. of North America,* 258 N. Y. 572, 180 N. E. 337; for distinction see *Silverstein* v. *Metropolitan Life Ins. Co.,* 254 N. Y. 81, 171 N. E. 914; *Smith* v. *Massachusetts Bonding & Ins. Co.,* 207 App. Div. 682, 202 N. Y. S. 857.

From the prevailing opinion on the last point considered in this opinion, I dissent. But since my associates disagree with me in this regard, as shown by their concurrence in the opinion of Mr. Justice LARSON, the judgment must be affirmed. Such is the order. Costs to respondent.

LARSON, Justice (concurring in part).

There are three questions presented and to be determined on this appeal: First. Was the continuity of total disability broken by the period from May 16th to June 12th, inclusive? Second. Were the appellant's defenses of payment, accord and satisfaction, and settlement and discharge proved and

established? Third. Was plaintiff's disability during the entire time for which the court gave him judgment caused by injuries due to the accident?

I concur fully with Mr. Justice WOLFE in his analysis and solution of and answers to the first and second questions. As to those matters, I can add nothing to his masterful presentation of the questions and am content to incorporate, by reference, his views on those questions into this opinion.

But, as to the points involved in the third question, I am unable to agree with the views of Mr. Justice WOLFE, and shall therefore consider that question. The policy of insurance provides:

"The Equitable Life Assurance Society Of The United States Hereby insures the person named as applicant * * * against loss *resulting directly and independently of all other causes*, from bodily injuries effected during the term of this policy solely through external, violent and accidental means, and against disability from disease contracted during the term of this policy. * * *"

The meaning and application of the italicized expression, and what the evidence shows thereunder, are the two matters wherein I differ from my associate. Two questions shall therefore receive consideration: (1) The meaning and construction of the expression "resulting directly and independently of all other causes," and the extent to which it may be urged as a defense. (2) Does the evidence sustain a finding that plaintiff's disability results "directly and independently of all other causes" from the injury to his index finger when he fell on April 20, 1934, within the meaning of the policy? We discuss them in order.

Insurance policies, while in the nature of written contracts, are not prepared after negotiations between the parties, to embrace the terms at which the parties have arrived in their negotiations. They are prepared beforehand by the insurer, and the company solicitors then sell the insurance idea to the applicant. Normally, the details and provisions of the policy are not dis-

cussed, except that the particular form of policy is best suited to give the applicant the protection he seeks. If he reads the policy he is generally not in a position to understand its details, terms, and meaning except that, in the event against which he seeks insurance, the company will pay the stipulated sums. He seldom sees the policy until it has been issued and is delivered to him. He signs an application blank in which the policy sought is described either by form number or by a general designation, pays his premium, and in due course thereafter receives, either from the agent or through the mails, his policy. Many of its terms and all of its defenses and super-refinements he has never heard of and would not understand them if he read them. Such fact is evident from the fact that cases like this arise where lawyers and courts disagree as to what such provisions mean. In fact, there are about as many different constructions by the courts of terms such as those involved here as there are insurance companies issuing such policies. For this reason the rule of strictissimi juris has been applied almost universally to insurance contracts, and this jurisdiction, like many others, has declared in favor of a liberal construction in favor of the insured to accomplish the purpose for which the insurance was taken out and for which the premium was paid. *Colovos* v. *Home Life Ins. Co. of New York,* 83 Utah 401, 28 P. (2d) 607; *Gibson* v. *Equitable Life Assur. Society of United States,* 84 Utah 452, 453, 36 P. (2d) 105.

The courts, in interpreting the clause in insurance policies like that here involved, to wit: *An injury effected through violent, external, and accidental means, entirely independent of all other causes,* have made three distinctions or classes of cases: (1) When an accident causes a diseased condition which, together with the accident, results ▮ in the injury or death complained of, the accident alone is to be considered as the cause of the injury or death. *French* v. *Fidelity & Casualty Co.,* 135 Wis. 259, 115 N. W. 869, 17 L. R. A. (N. S.) 1011; *Cary* v. *Preferred Acc. Ins.*

*Co. of New York*, 127 Wis. 67, 106 N. W. 1055, 5 L. R. A. (N. S.) 926, 115 Am. St. Rep. 997, 7 Ann. Cas. 484. (2) When, at the time of the accident, the insured was suffering from some disease, but the disease had no causal connection with the injury or death resulting from the accident, the accident is to be considered the sole cause. *Bohaker* v. *Travelers' Ins. Co.*, 215 Mass. 32, 102 N. E. 342, 344, 46 L. R. A. (N. S.) 543. (3) When at the time of the accident, *there was an existing disease* which, co-operating with the accident, resulted in the injury or death, the accident cannot be considered as the sole cause, or as the cause independent of all other causes. *Smith* v. *Federal Life Ins. Co.* (D. C.) 6 F. (2d) 283; *Cretney* v. *Woodmen Acc. Co.*, 196 Wis. 29, 219 N. W. 448, 62 A. L. R. 675; *Leland* v. *Order of United Commercial Travelers of America*, 233 Mass. 558, 124 N. E. 517, 520.

The trial court was of the opinion that this case falls within the first class, while Mr. Justice WOLFE thinks it falls within the third class. Without repeating in detail, we accept the statement of the evidence on this matter as set out by Mr. Justice WOLFE with the following additions: The medical evidence indicated that Dr. Browning had some infected teeth and diseased tonsils and, therefore, probably had some toxemia in his system; that, due to the sprain and bruise of the finger joint, the toxemia localized in the injured part and delayed and perhaps prevented recovery. But Dr. Spencer and Dr. Baldwin both testified, that, had the injury not been sustained, there would probably have been no inflammation at that particular part of the body, that it was highly improbable that arthritis would otherwise manifest itself in that joint, and that it was the devitalizing of the injured parts that induced the attack of arthritis; that prior to the injury the insured gave no evidence of systemic toxemia, and there is no evidence that it manifested itself at any other point in the body. Upon such a record, the trier of the facts may well conclude that the diseased condition of

the finger was caused by the accident, and the case falls in class (1) above set out.

On such a record, can the case fall within class (3) so as to bar a recovery? This class requires that there be an *existing disease*, one existing at the time of the accident, which co-operates with the accident to produce the disability. *Cretney* v. *Woodmen Acc. Co.*, 196 Wis. 29, 219 N. W. 448, 62 A. L. R. 675. We have searched ▮▮▮ the record in vain for any evidence that there was an *existing disease* within the meaning of the law, at the time of the accident, which produced the disability. Two propositions of law are thus presented which we shall discuss from the authorities. First, that an *existing disease*, to take a case out of the insured provisions of the policy, does not mean a temporary disorder or derangement of the bodily organs, system, or functions, nor does it mean a tendency or susceptibility to a disease, but means a chronic or definite affliction such as would be embraced in the common understanding and meaning of the term "diseased" or "sick"; and, second, that the term "independently of all other causes" does not mean uninfluenced or unaffected by any other cause, but means uncontrolled by any other cause, that is, that there was no independent intervening cause unproduced or uninfluenced by the injury, which, acting of itself and without stimulation by the injury, tends to produce the result.

A succinct statement of the rule as to disease is made by the Court of Appeals of New York, speaking through Mr. Chief Justice Cardozo (now on the Supreme Court of the United States) in *Silverstein* v. *Metropolitan Life Ins. Co.*, 254 N. Y. 81, 171 N. E. 914, 915:

"In a strict or literal sense, any departure from an ideal or perfect norm of health is a disease or an infirmity. Something more, however, must be shown to exclude the effects of accident from the coverage of a policy. The disease or the infirmity must be so considerable or significant that it would be characterized as disease or infirmity in the common speech of men. *Eastern Dist. Piece Dye*

*Works* v. *Travelers' Ins. Co.*, 234 N. Y. 441, 453, 138 N. E. 401, 26 A. L. R. 1505. 'Our guide is the reasonable expectation and purpose of the ordinary business man when making an ordinary business contract.' *Bird* v. *St. Paul Fire & Marine Ins. Co.*, 224 N. Y. 47, 51, 120 N. E. 86, 87, 13 A. L. R. 875; *Goldstein* v. *Standard Accident Ins. Co.*, 236 N. Y. 178, 183, 140 N. E. 235, 236; *Van Vechten* v. *American Eagle Fire Ins. Co.*, 239 N. Y. 303, 146 N. E. 432, 38 A. L. R. 1115. A policy of insurance is not accepted with the thought that its coverage is to be restricted to an Appollo or a Hercules."

We must bear in mind a distinction between a condition which, when tested by perfection, may be unsound or abnormal, yet of such nature that common speech would not call it a disease or infirmity but a susceptibility or predisposing tendency because its danger is remote or potential only, and a condition that in its natural and probable development may be, in the common understanding of man, so abnormal or morbid as to be described as a disease or infirmity. *Leland* v. *Order of United Commercial Travelers of America*, supra; *Collins* v. *Casualty Co. of America*, 224 Mass. 327, 112 N. E. 634, L. R. A. 1916E, 1203; *Mutual Life Ins. Co.* v. *Dodge* (C. C. A.) 11 F. (2d) 486, 59 A. L. R. 1290; *Taylor* v. *New York Life Ins. Co.*, 176 Minn. 171, 222 N. W. 912, 60 A. L. R. 959; *Cheswell* v. *Fraternal Acc. Ass'n*, 199 Mass. 267, 85 N. E. 96. The governing principle has been stated by Mr. Chief Justice Rugg of Massachusetts in the Leland Case, supra, as follows:

"If there is no active disease, but merely a frail general condition, so that powers of resistance are easily overcome, or merely a tendency to disease which is started up and made operative, whereby death results [or disability occurs] then there may be recovery even though the accident would not have caused that effect upon a healthy person in a normal state."

Any other construction would be so doctrinaire, so headed toward futility, that it would reduce a policy and its coverage to contradiction and absurdity.

All of us, at all times, probably have in our systems microbes, germs, and bacteria of many diseases—pneumococcus, streptococcus, staphylococcus, tuberculosis, and in-

fluenza bacillus, ad infinitum—but which in the normal course of our lives we may successfully ward off. Because in warding off such possible diseases we may be in a weakened condition of strength and resistance, we may the more readily succumb to an injury accidentally sustained by external violence. The injury, not the presence of the disease germs in the system, would still be the cause of death or disability.

Cases where disease and accident are involved under insurance policies are three-fold: (a) Where a disease, as such, exists at the time of the accident and contributes to the effect of the accident. (b) Where the disease, nonexistent as such, at the time of the accident, develops due to the weakening of the body by the accident, and is thereby causally connected with the accident. (c) Where a disease develops after the accident, but is not causally connected therewith. Classes (b) and (c) mark the difference between the case under consideration and the case emphasized and relied upon by appellant and by Mr. Justice WOLFE, to wit, *Wrobel* v. *General Acc., Fire and Life Assur. Corporation,* 288 Mass. 206, 192 N. E. 498, 500. In that case the trial court specifically found there was no causal connection between the accident and the neurofibroma which later developed. The court says, "It was a question of fact whether on all the evidence, neurofibroma had any causal connection with the injury. The finding that it did not have such connection cannot be pronounced to be without support in the evidence. That fact being established, it remained for the trial judge to find" the length of time disability was due to the accident alone.

In the case before us, the trial court found as a fact that the injury to the finger through the whole period claimed by plaintiff was due to the accident; that there was a causal connection between the sprain and trauma of the accident and the arthritis and stiffness which developed in the finger. Such finding may be close on the evidence but it cannot be held unwarrantable as a matter of

law. On the reasoning and the decision in the Wrobel Case, therefore, this judgment, like the one there, should be affirmed.

Let us see what the courts have said as to the expression, *directly and independently of all other causes, through accidental means.* "Accidental means" is used in the policy of insurance in its common significance, that of happening unexpectedly, without intention or design. *United States Mut. Acc. Ass'n v. Barry*, 131 U. S. 100, 9 S. Ct. 755, ■ 33 L. Ed. 60. Accident is a comprehensive term, much broader than negligence. It would be error to rule as a matter of law that the disability was not effected "directly and independently of all other causes" through the injury received in the fall. The point of difference is as to whether the toxemia probably existing in the body of the insured was not a cause co-operating with the fall in inducing the disability. But this toxemia was simply a condition and not a moving cause of the injury. A sick man may be the subject of an accident which would not have befallen him but for his sickness. One may meet his death by falling into a place of danger in a faint or in a fit of epilepsy. But an event has usually been held to be the result of an accident, not of disease. In *Manufacturers' Acc. Indem. Co. v. Dorgan*, 58 F. 945, 954, 7 C. C. A. 581, 22 L. R. A. 620, it was said by Mr. Justice Taft:

"If the deceased suffered death by drowning, no matter what was the cause of his falling into the water, whether disease or a slipping, the drowning, in such case, would be the proximate and sole cause of the disability or death, unless it appeared that death would have been the result, even had there been no water at hand to fall into. The disease would be but the condition; the drowning would be the moving, sole, and proximate cause." See, also, *Winspear v. Acc. Ins. Co.*, 6 Q. B. Div. 42; *Ludwig v. Preferred Acc. Ins. Co.*, 113 Minn. 510, 130 N. W. 5; *Preferred Acc. Ins. Co. v. Muir*, 126 F. 926, 61 C. C. A. 456.

"The language of this contract to the effect that the "accidental means' must have operated 'independently of all other causes,' to produce the death, does not change the general rule of law, that the proximate and not a remote cause is the one to which the law looks," said Mr. Chief Justice Rugg in *Bohaker v. Travelers' Ins. Co.*, supra.

The policy before us does not provide that recovery shall be had only if no other circumstance than the accident contributes to the disability either proximately or remotely, directly or indirectly, wholly or in part. We are not required to search beyond the proximate, efficient, and inducing cause to see if there may be latent causes. When there is evident a single agency acting directly and predominantly to produce an injury as a natural result, which agency acted independently of other like causes, the conditions of the policy have been met and fulfilled, provided such agency comes within the scope of an accidental one.

There are numerous cases where a slight wound became infected and from such infection, and not from the accident itself, as such, disability or death resulted. The better reasoned cases hold that but for the accidental injury there would have been no infection developing, and therefore the accident was the proximate and sole cause of the disability or death. *Cary* v. *Preferred Acc. Ins. Co.*, supra; *French* v. *Fidelity & Casualty Co.*, supra.

But counsel insist that the phrase in question does not mean the "sole proximate cause"; that there was an independent intervening cause, the arthritis, which aggravated the disability and, therefore, defendant is not liable. We cannot accept this interpretation of the language nor the conclusion made therefrom. Substantially the same language is found in the policy construed in *Hall* v. *American Masonic Acc. Ass'n*, 86 Wis. 518, 57 N. W. 366, where death resulted from apoplexy. The court sustained the finding of the jury that the accident was the proximate cause of the apoplexy which intervened causing death. The same clause was again construed against appellant in *Weidner* v. *Standard Life & Acc. Ins. Co.*, 130 Wis. 10, 110 N. W. 246.

The intervening cause which follows as a natural, though not necessary consequence of accidental injury cannot, therefore, be considered an independent cause. An intervening cause, set in motion by the accidental injury, is a result

of the accident and not an independent cause. The language used can have no broader meaning than the ▉ words "sole and proximate cause." Thus, blood poisoning resulting from an abrasion of the skin on the toe has been held within the policy. *Western Commercial Travelers' Ass'n* v. *Smith,* 85 F. 401, 56 U. S. Ap. 393, 29 C. C. A. 223, 40 L. R. A. 653. So, too, has pneumonia caused by taking cold while confined to bed as the result of an accident, when this would not have occurred had the person been in normal health. *Isitt* v. *Railway Passenger Assur. Co.,* 22 Q. B. Div. 504. And in *Delaney* v. *Modern Acc. Club,* 121 Iowa 528, 97 N. W. 91, 63 L. R. A. 603, it is held that, where a disease follows as a natural, though not necessary, result of the injury, it is an accident within the policy. And, where a man engaged in a fight received an abrasion on the hand and blood poison set in from germs received from the mouth of the person struck, a recovery was allowed. *Carroll* v. *Fidelity & Casualty Co.* (C. C.) 137 F. 1012. This contract does not require us to indulge in the niceties of analysis to ascertain whether in the chain of causations there is another cause, more hidden in its origin or more subtle and hidden in its operations, which may more indirectly have a causal connection with the injury. The single operating, proximate cause of the disability was found to be the fall and not the disease.

There being some supporting evidence, the finding of the trial judge will not be disturbed. We must therefore hold that where disability results, even though aggravated or intensified by a disease which follows as a natur- ▉▉ al, though not necessary, consequence of an accidental physical injury, or where the disease is induced or set in motion as a result of the injury, the disability or death is deemed the proximate result of the injury and not of the disease as an independent cause. It follows that the judgment of the district court should be affirmed.

FOLLAND, C. J., and HANSON and MOFFAT, JJ., concur in the opinion of LARSON, J.